**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS**

**JIMMIE G. STEWART,**
        **Plaintiff,**

**v.**                                                    **Civil Action No.: 2:08-CV-119**
                                                         **JUDGE MAXWELL**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

        **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING**
**THAT THE DISTRICT COURT GRANT DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT [14], DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [11],**
**AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

## I.        INTRODUCTION

On December 3, 2008, Plaintiff Jimmie G. Stewart ("Plaintiff"), by counsel Joyce H. Morton,

Esq., of VanNostrand & Morton, PLLC, filed a complaint in this Court to obtain judicial review of

the final decision of Defendant Michael J. Astrue, Commissioner of Social Security

("Commissioner" or "Defendant") pursuant to Section 205(g) of the Social Security Act, as

amended, 42 U.S.C. § 405(g).  On February 6, 2009, the Commissioner, by counsel Helen Campbell

Altmeyer, Assistant United States Attorney, filed an answer and administrative transcript of the

proceedings.  On March 2, 2009 and March 31, 2009, Plaintiff and the Commissioner filed their

respective Motions for Summary Judgment [11] [14].  Following review of the motions by the

parties and the transcript of administrative proceedings, the undersigned Magistrate Judge now

issues this Report and Recommendation to the District Judge.

## II. RELEVANT PROCEDURAL AND FACTUAL BACKGROUND AND REVIEW OF ADMINISTRATIVE LAW JUDGE DECISION

### A. Procedural Background

On July 19, 2001 and August 1, 2001, Plaintiff applied for supplemental security income and disability insurance benefits, alleging disability as of August 21, 2000. *See* Tr. at 135-37, & 616-19. On January 30, 2003, the United States Administrative Law Judge ("ALJ") held a hearing ("January 2003 ALJ Hearing"), and Plaintiff testified under oath. Tr. at 742-82. *See* 20 C.F.R. § 404.929 (hearing before an administrative law judge). In May 2003, the ALJ denied Plaintiff's application for disability. Tr. at 54-72. Plaintiff appealed this unfavorable decision to the Appeals Council. Tr. at 97-121. *See* 20 C.F.R. § 404.967 (Appeals Council review--general).

While the appeal was pending before the Appeals Council, Plaintiff again applied for supplemental security income on July 16, 2003, alleging disability as of December 25, 1999. Tr. at 631-34. In December 2003, a Disability Determinations Service Examiner found Plaintiff disabled from his July 2003 application based on the November 2003 mental evaluation by psychologist Lois Holloway, M.S. *See* Tr. at 73-74; (procedural history recited by Appeals Council); *see also* Tr. at 517-20 (Holloway mental evaluation); *see also* Tr. at 635 (disability determination). In August 2004, the Appeals Council vacated the December 2003 decision finding Plaintiff disabled because Dr. Holloway had stated that the IQ test results in the mental evaluation were invalid. Tr. at 73-75. The Appeals Council also consolidated the 2001 and 2003 applications and remanded the case to the ALJ for further proceedings. Tr. at 73-75. On March 23, 2005, and September 22, 2005, the ALJ held two additional hearings ("March 2005 ALJ Hearing" and "September 2005 ALJ Hearing"). Tr. at 659-707 & 709-41. The Honorable Karl Alexander was the ALJ who presided over Plaintiff's three hearings. Pl. Doc. 12 at 2. On January 19, 2006, the

ALJ issued an unfavorable decision to the Plaintiff, finding him not entitled to disability insurance benefits and supplemental security income.  Tr. at 20-40.

## B.      Standard for Judicial Review of a Decision by the Administrative Law Judge in a Disability Case

Judicial review of a final decision regarding disability benefits is limited to determining whether the findings...are supported by substantial evidence and whether the correct law was applied.  *See* 42 U.S.C. § 405(g).  "The findings...as to any fact, if supported by substantial evidence, shall be conclusive" *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  *See Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938))...Substantial evidence...consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance...Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment...if the decision is supported by substantial evidenc,e.  *See Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir.1962).  Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. *King v. Califano*, 599 F.2d 597, 599 (4th Cir.1979).  **"This Court does not find facts or try the case *de novo* when reviewing disability determinations."**  *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir.1976); "We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of non-persuasion."  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir.1972).  "The language of the Social Security Act precludes a *de novo* judicial proceeding and requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"

*See Hays v. Sullivan*, 907 F.2d 1453 (4th Cir. 1990) (emphasis added).  In applying these legal standards, the Court reviews the decision by the ALJ.

### C.    Standard for Disability and Five-Step Evaluation Process

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work...“[W]ork which exists in the national economy” means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A).  In order for the ALJ to determine whether a plaintiff is disabled and therefore entitled to disability insurance benefits, the Social Security Administration has established a five-step sequential evaluation process.  The five steps are as follows (including Residual Functional Capacity Assessment prior to Step Four):

Step One:    Determine whether the plaintiff is engaging in substantial gainful activity;

Step Two:    Determine whether the plaintiff has a severe impairment;

Step Three:    Determine whether the plaintiff has “listed” impairment;

* Residual Functional Capacity Assessment *
(Needs to be Determined Before Proceeding to Step Four)

Step Four:    Compare residual functional capacity assessment to determine whether the plaintiff can perform past relevant work;

Step Five:    Consider residual functional capacity assessment, age, education, and work experience to determine if the plaintiff can perform any other work.

*See* 20 C.F.R. § 404.1520 (evaluation of disability in general).

In following the five-step process and coming to a decision, the ALJ makes findings of fact and conclusions of law. This Court will review the decision by the ALJ to determine whether it is supported by substantial evidence, in accordance with 42 U.S.C. § 405(g) and *Hays*.

### D.      Review of ALJ Application of Five-Step Evaluation Process and Whether it is Supported by Substantial Evidence

#### 1.      Step One: Determine whether the Plaintiff is Engaging in Substantial Gainful Activity

> Substantial gainful activity is work activity that is both substantial and gainful:
>
> (a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.
>
> (b) Gainful work activity. Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized....
>
> Generally, in evaluating your work activity for substantial gainful activity purposes, our primary consideration will be the earnings you derive from the work activity...
>
> If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled ***regardless of your medical condition*** or your age, education, and work experience.

*See* 20 C.F.R. § 404.1572; *see also* 20 C.F.R. § 404.1574(a)(1) (evaluation guide for employees who are not self-employed); *see also* 20 C.F.R. § 404.1520(b) (emphasis added).

The ALJ noted that Plaintiff has provided conflicting reports as to whether he continued to perform substantial gainful activity in construction while being paid in cash by his brother. Tr. at 26, 162, 185, & 217. However, the ALJ found that for purposes of this decision he would find that

Plaintiff had not engaged in substantial gainful activity at any time after the alleged disability date

of August 21, 2000. Tr. at 26. The parties do not dispute ALJ's findings in Step One.

### 2. Step Two: Determine whether the Plaintiff has a Severe Impairment

> [A] severe impairment...is any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities...

> An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities. Basic work activities...mean[s] the abilities and aptitudes necessary to do most jobs. Examples of these include--1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

*See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521; *see also Luckey v. U.S. Dept. of Health*

*& Human Services*, 890 F.2d 666 (4th Cir. 1989). The ALJ found Plaintiff to have the following

severe impairments: chronic headaches; cognitive disorder, not otherwise specified; and borderline

intellectual functioning. Tr. at 26. The parties do not dispute the ALJ's findings in Step Two.

### 3. Step Three: Determine whether the Plaintiff has a "Listed" Impairment

> If you have an impairment(s) that meets or equals one of our listings in appendix 1 of [Subpart P of Part 404] and meets the duration requirement, we will find that you are disabled.
> *See* 20 C.F.R. § 404.1520(d).

> The Listing of Impairments...describes...impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. *See* 20 C.F.R. § 404.1525(a).

> Most of the listed impairments are permanent or expected to result in death. *See* 20 C.F.R. § 404.1525(a).

We need evidence from acceptable medical sources (e.g. licensed physicians) to establish whether you have a medically determinable impairment(s). *See* 20 C.F.R. § 404.1513(a).

To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies ***all of the criteria*** in the listing. *See* 20 C.F.R. § 404.1513(a) (emphasis added).

***An impairment that manifests only some of those criteria, no matter how severely, does not qualify***. *See Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885 (1990) (emphasis added).

### a.    Listing Impairment 12.02 Organic Mental Disorders

Plaintiff contends that he meets the criteria for Listing Impairment 12.02 Organic Mental Disorders. Pl. Doc. 12 at 10-12. In order to satisfy the criteria for Listing Impairment 12.02 Organic Mental Disorders, the Plaintiff must establish:

**Listing 12.02 Organic Mental Disorders: Psychological or behavioral abnormalities associated with a dysfunction of the brain.** History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.

**The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.**

**A.** Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following: 1. Disorientation to time and place; or 2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or 3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or 4. Change in personality; or 5. Disturbance in mood; or 6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or 7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.;

**AND**

**B.** Resulting in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration;

**OR**

**C.** Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02 (emphasis added).

The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s) [and] consideration of **the degree of limitation such impairment(s) may impose on your ability to work...**

Each listing...consists of...paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations). There are [also] functional criteria (paragraph C criteria)...We will assess the paragraph B criteria before we apply the paragraph C criteria. We will assess the paragraph C criteria only if we find that the paragraph B criteria are not satisfied. We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or...C, when appropriate) of the listed impairment are satisfied...

**Need for longitudinal evidence.** Your level of functioning may vary considerably over time. The level of your functioning at a specific time may seem relatively adequate or, conversely, rather poor.

> **Proper evaluation of your impairment(s) must take into account any variations in the level of your functioning in arriving at a determination of severity over time. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication to establish your impairment severity...**

> *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00 Mental Disorders (emphasis added).

In order to determine whether Plaintiff qualified for Listing 12.02, the ALJ considered the testimony from the three ALJ Hearings; the relevant medical history; the medical limitations on Plaintiff's ability to work; and the longitudinal evidence in the record. The ALJ found that Plaintiff did not meet the requirements for Listing 12.02. Specifically, the ALJ found that although Plaintiff met the criteria under paragraph A, he did not meet the additional criteria under paragraph B, and he failed to meet the alternative criteria under paragraph C.

### (1)     Listing 12.02 Paragraph B Criteria

Plaintiff contends that he meets the criteria under paragraph B for Listing 12.02. Pl. Doc. 12 at 11. To meet the requirements under Paragraph B, Plaintiff would need to satisfy two of the following four criteria:

> (1) "Marked" restriction of activities of daily living; or (2) "Marked" difficulties in maintaining social functioning; or (3) "Marked" difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation, each of extended duration.

> *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02.

> Where we use "marked" as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis. *See* §§ 404.1520a and 416.920a.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 Mental Disorders. The ALJ compared the requirements for each of the paragraph B criteria to the testimony from the ALJ Hearings, the relevant medical history, the medical limitations on Plaintiff's ability to work, and the longitudinal evidence in the record.

### (a)  "Marked" Restriction of Activities of Daily Living

The first criteria under Listing 12.02, Paragraph B, is whether Plaintiff has "marked" restriction of activities of daily living.

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction. We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function. For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 Mental Disorders. The ALJ reviewed the relevant evidence in the record to determine whether Plaintiff meets the criteria for "marked" restriction of activities of daily living under Listing 12.02, Paragraph B.

In August 2001, Plaintiff completed a Disability Report and reported that he did not need any assistance with personal needs or grooming (i.e., washing, bathing, dressing, shaving, other). Tr. at 174. Plaintiff reported that he performs the housework of taking out the trash. Tr. at 175. Plaintiff stated that his activities and interests include watching television, listening to the radio,

hunting, fishing, and gardening. Tr. at 176. In December 2001, Plaintiff reported that he could still care for his personal needs. Tr. at 183. In April 2002, Plaintiff completed an Activities of Daily Living form and reported that he did not need any help any assistance with personal needs or grooming (i.e., washing, bathing, dressing, shaving, other). Tr. at 192. Plaintiff reported that he occasionally performs the housework of vacuuming, mopping floors, and taking out the trash. Tr. at 193. Plaintiff stated that his activities and interests include watching television, listening to the radio, listening to music, hunting, fishing, and walking. Tr. at 194.

In November 2002, Plaintiff's counsel referred him to Cardinal Psychological Services, LLC., for an evaluation with psychologists Frances Allen-Henderson, MA, LSW and L. Andrew Steward, Ph.D. Tr. at 415. Plaintiff told the psychologists that he likes to walk in the woods and hunt and fish when he can. Tr. at 418. Plaintiff stated he tries to visit with people, play with the kids, watch television, and rent movies for entertainment. Tr. at 418. Plaintiff reported that he maintains his own personal hygiene. Tr. at 419. At the January 2003 ALJ Hearing, Plaintiff testified that he attempts to do housework and chores when he can, and he also tries to watch the four children that reside with him and his wife in their home. *See* Tr. at 746-48 & 774. Plaintiff testified that for activities he tries to fish when he can and went hunting one time during the year with his brother and killed one deer. Tr. at 772. In February 2003, Plaintiff's counsel referred him to Marc W. Haut, Ph.D., a neuropsychologist. Tr. at 456-58 (spelled "Haq" in transcript). In Dr. Haut's evaluation, he found that Plaintiff's cognitive functioning satisfied the criteria for paragraph A of Listing 12.02, but did not satisfy the criteria for paragraph B. Tr. at 457. "...[H]e has only mild to moderate problems with his daily living skills..." Tr. at 457.

In March 2005, Plaintiff's counsel referred him to Chameleon Health Care for a

psychological evaluation with Michael D. Morrello, M.S. Tr. at 540. Plaintiff told Dr. Morrello that he enjoys entertaining visitors at home. Tr. at 542. Plaintiff stated he enjoys outdoor activities with his friends, and when he is at home, he enjoys sitting outside and laughing with his family. Tr. at 542. The psychologist described Plaintiff as adequately dressed and groomed for the evaluation. Tr. at 542. Plaintiff told the psychologist that he lives by himself in a house next to his brother; and to assist with family chores Plaintiff washes dishes and picks up around the house. Tr. at 542.

At the March 2005 ALJ Hearing, Plaintiff's sister-in-law, Cheryl Stewart testified that she has been married to Plaintiff's brother for 15 years and they have 3 children, ages 8, 11, and 14. Tr. at 713-14. Ms. Stewart stated that Plaintiff lives in an outbuilding on their property. Tr. at 713-15. The outbuilding has electricity but no plumbing, and Plaintiff comes in their house to use the bathroom, shower, and to eat with their family. Tr. at 715. Ms. Stewart said that Plaintiff came to live with them after getting "kicked out" by his wife. Tr. at 715. Ms. Stewart said that Plaintiff and his wife are now divorced. Tr. at 715. Ms. Stewart testified that she takes Plaintiff to his appointments; washes Plaintiff's laundry with her family's laundry; cooks for the family and Plaintiff eats with the family; does Plaintiff's household cleaning; grocery shops for her family and Plaintiff; and helps watch Plaintiff's children when he has them every Tuesday and alternate weekends. Tr. at 716, 719, & 723. Ms. Stewart said that she reminds Plaintiff to take a bath, and if she does not remind him, he will go 3 or 4 days without bathing. Tr. at 719. Ms. Stewart testified that Plaintiff calls and makes his own appointments; figures and sorts his own medications; and picks out his own clothes. Tr. at 717 & 723.

In October 2005, subsequent to the September 2005 ALJ Hearing, Dr. Haut abruptly changed his February 2003 opinion and decided that Plaintiff met the paragraph B criteria. Tr. at 595. Dr.

Haut had not personally met with Plaintiff since 2003 but instead based his opinion on the statements of Plaintiff's sister-in-law, Cheryl Stewart, who had testified at the March 2005 ALJ Hearing to assisting Plaintiff with his daily living activities including shopping, cooking, laundry, and personal hygiene. Tr. at 595.

Although Dr. Haut changed his opinion and found that Plaintiff met the criteria for "marked" restriction of activities of daily living based on the statements of Plaintiff's sister-in-law, the ALJ found that the testimony from the ALJ Hearings, the relevant medical history, the medical limitations on Plaintiff's ability to work, and the longitudinal evidence in the record support the finding that Plaintiff has no more than a mild to moderate limitation in this area. Tr. at 31. Substantial evidence supports the ALJ's decision that Plaintiff does not meet the first criteria of "marked" restriction of activities of daily living.

(b)        **"Marked" Difficulties in Maintaining Social Functioning**

The second criteria under Listing 12.02, Paragraph B, is whether Plaintiff has "marked" difficulties in maintaining social functioning.

> Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers. We do not define "marked" by a specific number of

> different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function. For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local storekeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 Mental Disorders. The ALJ reviewed the relevant evidence in the record to determine whether Plaintiff meets the criteria for "marked" difficulties in maintaining social functioning under Listing 12.02, Paragraph B.

In August 2001, Plaintiff completed a Disability Report and reported that he visits with relatives and does not have any problems getting along with other people. Tr. at 177. In April 2002, Plaintiff completed an Activities of Daily Living form and reported that he visits with friends and relatives and does not have any problems getting along with other people. Tr. at 195. In November 2002, Plaintiff's counsel referred him to psychologists Dr. Allen-Henderson and Dr. Steward. Tr. at 415. Plaintiff stated he tries to visit with people and play with the kids. Tr. at 418. The psychologists noted that rapport was easy to establish and maintain. Tr. at 419. In February 2003, Plaintiff's counsel referred him to Dr. Haut, a neuropsychologist. Tr. at 456-58. Dr. Haut noted that Plaintiff was "generally pleasant and cooperative with appropriate affect and actually a fairly good sense of humor." Tr. at 456. In Dr. Haut's evaluation, he found that Plaintiff's cognitive functioning satisfied the criteria for paragraph A of Listing 12.02, but did not satisfy the criteria for paragraph B. Tr. at 457. "...[H]e has only mild to moderate problems with his...social functioning..." Tr. at 457. In March 2005, Plaintiff's counsel referred him to the psychologist Dr. Morrello. Tr. at 540. Plaintiff reported to Dr. Morrello that in his former employment, he had positive relationships with his co-workers and supervisors. Tr. at 540. Plaintiff told Dr. Morrello that his friends are "fun" and that he is able to maintain his friendships. Tr. at 542. Plaintiff said

he is comfortable with the number of his friends and enjoys entertaining visitors at home. Tr. at 542.

Plaintiff stated that he enjoys outdoor activities with his friends, and when he is at home, he enjoys

sitting outside and laughing with his family. Tr. at 542. Dr. Morrello noted that Plaintiff made good

eye contact and was friendly, polite, and cooperative. Tr. at 542. Dr. Morrello stated that it was

easy to develop a rapport with Plaintiff. Tr. at 542.

The ALJ found that the testimony from the ALJ Hearings, the relevant medical history, the

medical limitations on Plaintiff's ability to work, and the longitudinal evidence in the record support

the finding that Plaintiff has no more than a mild to moderate limitation in this area. Tr. at 31.

Substantial evidence supports the ALJ's decision that Plaintiff does not meet the second criteria of

"marked" difficulties in maintaining social functioning.

### (c)  "Marked" Difficulties in Maintaining Concentration, Persistence, or Pace

The third criteria under Listing 12.02, Paragraph B, is whether Plaintiff has "marked"

difficulties in maintaining concentration, persistence, or pace.

> Concentration, persistence, or pace refers to the ability to sustain
> focused attention and concentration sufficiently long to permit the
> timely and appropriate completion of tasks commonly found in work
> settings. Limitations in concentration, persistence, or pace are best
> observed in work settings, but may also be reflected by limitations in
> other settings. In addition, major limitations in this area can often be
> assessed through clinical examination or psychological testing.
> Wherever possible, however, a mental status examination or
> psychological test data should be supplemented by other available
> evidence...
>
> We must assess your ability to complete tasks by evaluating all the
> evidence, with an emphasis on how independently, appropriately, and
> effectively you are able to complete tasks on a sustained basis. We
> do not define "marked" by a specific number of tasks that you are
> unable to complete, but by the nature and overall degree of
> interference with function. You may be able to sustain attention and
> persist at simple tasks but may still have difficulty with complicated

> tasks. Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion. However, if you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 Mental Disorders. The ALJ analyzed the relevant evidence in the record to determine whether Plaintiff meets the criteria for "marked" difficulties in maintaining concentration, persistence, or pace under Listing 12.02, Paragraph B.

In February 2003, Plaintiff's counsel referred him to Dr. Haut, a neuropsychologist. Tr. at 456-58. Dr. Haut found that Plaintiff's cognitive functioning satisfied the criteria for paragraph A of Listing 12.02, but did not satisfy the criteria for paragraph B. Tr. at 457. "While he has significant and marked difficulty with concentration and pace...he has only mild to moderate problems with his...ability to function in a work-like setting as a result of his cognitive functioning. He may have a mild adjustment disorder, but no permanent psychiatric condition." Tr. at 457. Following review of the evidence in the record, the ALJ failed to accept Dr. Haut's opinion that Plaintiff has marked difficulty with concentration and pace, primarily due to Plaintiff's ability to function long-term as a truck driver with no accidents. Tr. at 32.

In July 2001, Plaintiff completed a Disability Report and reported that the job he did the longest was as a truck driver and he "hauled all kinds of stuff all over the country..." Tr. at 162. Plaintiff also reported that he worked as a carpenter in construction. Tr. at 162. Plaintiff noted that he did not attend special education classes and was not IQ tested in school. Tr. at 166-67.

In April 2002, Plaintiff completed a Work History Report and stated that from around 1995

through 1999, he worked in jobs in construction and logging. Tr. at 185. In these jobs, Plaintiff frequently lifted 50 pounds and used tools such as a hammer, nail gun, tape measure, and chain saw. Tr. at 185-87. Plaintiff wrote that he also operated a bulldozer and drove a truck. Tr. at 187. Plaintiff reported that in his work as a truck driver, he worked as many hours as allowed and used technical knowledge or skills in his position. Tr. at 188. Plaintiff stated that his job required the knowledge of driving a semi-truck and trailer. Tr. at 188.

In November 2002, Plaintiff's counsel referred him to psychologists Dr. Allen-Henderson and Dr. Steward. Tr. at 415. Plaintiff told the psychologists he quit school sometime before high school in order to "support the family." Tr. at 418. Plaintiff reported that he obtained a driver's license after taking the oral test. Tr. at 418. In addition, Plaintiff reported that he had a commercial driver's license ("CDL") and worked for the State of Florida driving a truck. Tr. at 418. Following IQ testing, the psychologists opined that Plaintiff's "past work history (the fact that he was able to obtain his CDL license and driver's license) and lack of mental retardation diagnosis before the age of 18 suggests that he is functioning in the borderline range of intelligence." Tr. at 423.

At the January 2003 ALJ Hearing, Plaintiff testified that he had to take a federal test to obtain his CDL. He stated that he was able to pass the test by cheating because his employer gave him the answers. Tr. at 750. In August 2003, Plaintiff reported that he worked as a truck driver from 1994 through 1995. Tr. at 217. Plaintiff stated that his longest job involved operating equipment, working with a service tractor, and loading and unloading equipment. Tr. at 217. Plaintiff said that operating equipment required use of machines, tools, or equipment and required technical knowledge or skills. Tr. at 217.

In November 2003, psychologist Dr. Holloway conducted an Adult Mental Profile evaluation

of Plaintiff. Tr. at 517. Dr. Holloway noted that Plaintiff has no record of inpatient or outpatient mental health services. Tr. at 518. Dr. Holloway performed IQ Testing, but she declared that the results were invalid due to poor motivation by Plaintiff. Tr. at 519. In March 2005, Plaintiff's counsel referred him to the psychologist Dr. Morrello, who stated that Plaintiff was able to understand and follow instructions. Tr. at 542.

At the September 2005 ALJ Hearing, medical expert C. David Blair, Ph.D., a neuropsychologist, testified that Plaintiff had the severe impairment of a "cognitive disorder, not otherwise specified." Tr. at 666-67. Dr. Blair opined that the February 2003 evaluation by Dr. Haut is the most coherent information in the record. Tr. at 664. Dr. Blair agreed with Dr. Haut's assessment that Plaintiff satisfied the criteria for paragraph A of Listing 12.02 but failed to satisfy the criteria for paragraph B. Tr. at 665-66. The ALJ questioned Dr. Blair regarding Plaintiff's ability to obtain a CDL by cheating and what affect that has on Plaintiff's diagnosis. Tr. at 668. Dr. Blair responded that using a cheat sheet and performing work tasks suggests a certain amount of ability. Tr. at 668. Dr. Blair stated that Plaintiff was operating in the borderline range of functioning but "we don't have the criteria for a diagnosis for mental retardation." Tr. at 669. Dr. Blair agreed with the ALJ's assessment that Plaintiff's ability to function as a commercial truck driver for some period of time would suggest sufficient attention, concentration, and memory abilities in order to perform unskilled work that would only involve routine and repetitive instructions. Tr. at 669-70. The ALJ asked Dr. Blair to reconcile Dr. Haut's assessment that Plaintiff has marked limitations in concentration, persistence, and pace with Plaintiff's ability to function as a commercial truck driver. Tr. at 670. Dr. Blair stated that driving is one of the most complex neuro-cognitive activities to perform, and "marked limitations in concentration, persistence,

and pace" would seemingly interfere with the ability to drive a truck. *See* Tr. at 670. Dr. Blair concluded that Plaintiff did not meet the requirements of *any* Listing Impairment. Tr. at 674 (emphasis added).

The ALJ found that the testimony from the ALJ Hearings, the relevant medical history, the medical limitations on Plaintiff's ability to work, and the longitudinal evidence in the record support the finding that Plaintiff has a moderate limitation in this area. Tr. at 32. Substantial evidence supports the ALJ's decision that Plaintiff does not meet the third criteria of "marked" difficulties in maintaining concentration, persistence, or pace.

**(d)      Repeated Episodes of Decompensation, Each of Extended Duration**

The fourth criteria under Listing 12.02, Paragraph B, is whether Plaintiff has experienced repeated episodes of decompensation, each of extended duration.

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 Mental Disorders. The ALJ reviewed the relevant evidence in the record to determine whether Plaintiff meets the criteria for repeated episodes of decompensation, each of extended duration, under Listing 12.02, Paragraph B.

In November 2002, Plaintiff's counsel referred him to psychologists Dr. Allen-Henderson

and Dr. Steward. Tr. at 415. The psychologists found that Plaintiff had experienced three (3) episodes of decompensation but failed to state what evidence supported this finding. Tr. at 415-24 & 435. In fact, Plaintiff told them he had never been hospitalized for emotional problems. Tr. at 418. In addition, the psychologists opined that Plaintiff's "past work history (the fact that he was able to obtain his CDL license and driver's license) and lack of mental retardation diagnosis before the age of 18 suggests that he is functioning in the borderline range of intelligence." Tr. at 423. In February 2003, Plaintiff's counsel referred him to Dr. Haut, who found that Plaintiff "may have a mild adjustment disorder, but no permanent psychiatric condition." Tr. at 457. In November 2003, psychologist Dr. Holloway, conducted an Adult Mental Profile evaluation of Plaintiff. Tr. at 517. Dr. Holloway noted that Plaintiff has no record of inpatient or outpatient mental health services. Tr. at 518.

In October 2005, subsequent to the September 2005 ALJ Hearing, Dr. Haut abruptly changed his February 2003 opinion, and he also decided that Plaintiff had experienced "one or two" episodes of decompensation. Tr. at 595 & 612. Dr. Haut had not personally met with Plaintiff since 2003 but instead based his opinion on the statements of Plaintiff's sister-in-law, Cheryl Stewart, who had testified at the March 2005 ALJ Hearing to assisting Plaintiff with his daily living activities including shopping, cooking, laundry, and personal hygiene. Tr. at 595. For the discussion of Plaintiff's activities of daily living and personal hygiene, *see* Section II.D.3.a.(1)(a), *supra*, of this Report and Recommendation.

The ALJ found that the testimony from the ALJ Hearings, the relevant medical history, the medical limitations on Plaintiff's ability to work, and the longitudinal evidence in the record support the finding that Plaintiff has failed to establish any episodes of decompensation. Tr. at 33.

Substantial evidence supports the ALJ's decision that Plaintiff does not meet the fourth criteria of repeated episodes of decompensation.

### (2) Listing 12.02 Paragraph C Criteria

The ALJ found that Plaintiff failed to meet the alternate requirements of Paragraph C under Listing 12.02. Tr. at 33. To meet the requirements under Paragraph C, Plaintiff would need to establish the following criteria:

> Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02. The ALJ found that Plaintiff has not established episodes of decompensation; Plaintiff has no more than a mild or moderate limitation in activities; and maintains his own personal hygiene. *See supra*, Sections II.D.3.a.(1)(a) & (d), of this Report and Recommendation. The ALJ found that since Plaintiff worked as a commercial truck driver for a long period of time, he is able to function outside a highly supportive living arrangement. Tr. at 32-33. From the longitudinal evidence in the record, substantial evidence supports the ALJ's decision that Plaintiff does not meet the alternative criteria under Listing 12.02, Paragraph C.

### (3) Listing Impairment 12.02 Organic Mental Disorders Conclusion by the ALJ

The ALJ considered the testimony from the three ALJ Hearings; the relevant medical history;

the medical limitations on Plaintiff's ability to work; and the longitudinal evidence in the record to

find that Plaintiff did not meet the requirements for Listing 12.02. Tr. at 28-33. Specifically, the

ALJ found that although Plaintiff met the criteria under paragraph A, he did not meet the additional

criteria under paragraph B, and he failed to meet the alternative criteria under paragraph C. Tr. at

28-33. Substantial evidence supports the ALJ's decision that Plaintiff does not meet the criteria for

Listing Impairment 12.02.

### b.    Listing Impairment 12.05 (Mental retardation)

The ALJ also found that Plaintiff did not meet the criteria for Listing Impairment 12.05.

In order to satisfy the criteria for Listing Impairment 12.05 (Mental retardation), the Plaintiff

must establish:

> **12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.** The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; Or B. A valid verbal, performance, or full scale IQ of 59 or less; Or C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; Or D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration.

> 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (emphasis added).

> **Need for longitudinal evidence.** Your level of functioning may vary

considerably over time. The level of your functioning at a specific time may seem relatively adequate or, conversely, rather poor. **Proper evaluation of your impairment(s) must take into account any variations in the level of your functioning in arriving at a determination of severity over time. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication to establish your impairment severity...**

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00 Mental Disorders (emphasis added).

Plaintiff cites *Turner v. Bowen*, 856 F.2d 695 (4th Cir. 1988) and *Branham v. Heckler*, 775 F.2d 1271 (4th Cir.1985) in support of his argument that he meets the requirements for 12.05C despite the lack of a diagnosis of mental retardation prior to age 22. Pl. Doc. 12. at 12. "We think that there may be many reasons why an individual would not have had the opportunity or need to have a formal intelligence quotient ("IQ") test until later in life. The fact that one was not earlier taken does not preclude a finding of earlier retardation." *Turner*, 856 F.2d at 698 citing *Branham*, 775 F.2d at 1274. However, this case differs from *Turner* and *Branham* because the ALJ found that Plaintiff is not mentally retarded but that he is functioning in the borderline range of intelligence. Tr. at 31. The ALJ based this conclusion on the relevant evidence in the record.

**(1)     Evidence in Record Relevant to Listing Impairment 12.05 (Mental retardation)**

In July 2001, Plaintiff completed a Disability Report and reported that he did not attend special education classes and was not IQ tested in school. Tr. at 166-67. In November 2002, Plaintiff's counsel referred him to psychologists Dr. Allen-Henderson and Dr. Steward. Tr. at 415. The psychologists IQ tested Plaintiff and reported a verbal IQ of 65; a performance IQ of 70; and a full scale IQ of 64. Tr. at 419. Following IQ testing, the psychologists opined that Plaintiff's "past work history (the fact that he was able to obtain his CDL license and driver's license) and lack of mental retardation diagnosis before the age of 18 suggests that he is functioning in the borderline range of intelligence." Tr. at 423. In February 2003, Plaintiff's counsel referred him to Dr. Haut, who found that Plaintiff "may have a mild adjustment disorder, but no permanent psychiatric condition." Tr. at 457. In November 2003, psychologist Dr. Holloway conducted an Adult Mental Profile evaluation of Plaintiff. Tr. at 517. Dr. Holloway noted that Plaintiff has no record of inpatient or outpatient mental health services. Tr. at 518. Dr. Holloway IQ tested Plaintiff and reported a verbal IQ of 59; a performance IQ of 69; and a full scale IQ of 60, but she declared that the results were invalid due to poor motivation by Plaintiff. Tr. at 519. In March 2005, Plaintiff's counsel referred him to the psychologist Dr. Morrello, who IQ tested Plaintiff and reported a verbal IQ of 64; a performance IQ of 76; and a full scale IQ of 66. Tr. at 543. Dr. Morrello stated that Plaintiff was able to understand and follow instructions. Tr. at 542.

At the September 2005 ALJ Hearing, medical expert Dr. Blair, a neuropsychologist, testified that Plaintiff had the severe impairment of a "cognitive disorder, not otherwise specified." Tr. at 666-67. Dr. Blair stated that Plaintiff was operating in the borderline intellectual range but "we don't have the criteria for a diagnosis for mental retardation." Tr. at 669. Dr. Blair noted that Dr.

Haut's report did not state that Plaintiff was unable to follow directions. Tr. at 683. "I was expecting to see that in Dr. Haut's report...That would have been a prominent piece of information...And a neuropsychologist would look for this...this is a Ph.D. level...person who's Board certified...So he would be looking for this. And I looked for that in the...report...and...I'm not seeing it." Tr. at 683-84. Dr. Blair concluded that Plaintiff did not meet the requirements of **any** Listing Impairment. Tr. at 674 (emphasis added).

The ALJ found that Plaintiff has no more than a mild or moderate limitation in activities and social functioning; Plaintiff maintains his own personal hygiene; Plaintiff has only a moderate limitation in maintaining concentration, persistence, or pace; and Plaintiff has not established any episodes of decompensation. *See supra*, Sections II.D.3.a.(1)(a)(b)(c) & (d), of this Report and Recommendation.

Plaintiff argues that the ALJ disregarded his school records, which showed that Plaintiff received failing grades of "D's"and "F's." Pl. Doc. 12. at 12. At the September 2005 ALJ Hearing, the medical expert Dr. Blair testified that there are a lot of reasons someone can fail school. Tr. at 676. Dr. Blair opined that failing school does not necessarily have to do with other aspects of adaptive functioning. Tr. at 676. Dr. Blair stated that many high school graduates are functionally illiterate and of average, borderline, or low average intelligence. Tr. at 676. Dr. Blair noted that according to the March 2005 Dr. Morrello evaluation, Plaintiff reads at the third grade level, performs arithmetic at the fourth grade level, and spelling at the first grade level. Tr. at 677. Dr. Blair stated that this is an accomplishment or achievement and does not necessarily reflect mental capability. Tr. at 677. At the September 2005 ALJ Hearing, counsel for Plaintiff asked Dr. Blair to give his opinion after considering Plaintiff's longstanding neurological problem; his IQ scores;

and the assistance provided by Plaintiff's sister-in-law. Tr. at 680-81. Dr. Blair opined that **to satisfy the criteria for mental retardation, Plaintiff would need good solid evidence that he has never functioned outside of constant assistance by other people, i.e., never functioned independently.** Tr. at 682 (emphasis added). The ALJ found that since Plaintiff worked as a commercial truck driver for a long period of time, he is able to function outside a highly supportive living arrangement. Tr. at 32-33.

Plaintiff states that Dr. Blair had only reviewed the psychological reports and did not have access to Plaintiff's medical records, the transcripts from the January 2003 and March 2005 ALJ Hearings, or Plaintiff's school records. Pl. Doc. 12 at 13. However, at the September 2005 ALJ Hearing, Dr. Blair was able to answer all the questions from the ALJ and Plaintiff's counsel without these documents. Tr. at 662-702. Even when the ALJ or Plaintiff's counsel questioned Dr. Blair regarding the school records or prior testimony, Dr. Blair was able to answer the questions after a brief summary of the content of the school records or testimony. Tr. at 675-702. In addition, much of Plaintiff's relevant medical information is summarized within the psychology reports. Tr. at 415-17, 456, 517-18, & 540-42. Moreover, Plaintiff acknowledged that the medical expert offered testimony that supported his position without the help of the other documents. Pl. Doc. 12 at 13. However, Plaintiff reiterates that Dr. Blair should have been able to review the entire record but fails to cite any material item that Dr. Blair was not able to review. Pl. Doc. 12 at 13. "Evidence is new within the meaning of this section if it is not duplicative or cumulative...[e]vidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Wilkins v. Secretary, Dept. of Health and Human Services*, 953 F.2d 93 (4th Cir. 1991). The Court finds that the school records, transcripts, and medical records were merely cumulative and would not have

altered Dr. Blair's opinion and thus do not warrant a remand.

### (2)    Credibility of Plaintiff

Plaintiff contends that the ALJ failed to make a credibility determination in accordance with SSR 96-7P.

> The regulations describe a two-step process for evaluating symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness:
>
> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms...
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, ***the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record***.  This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.  This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 C.F.R. § 404.1529(c)(4) and § 416.929(c)(4)...

*See* SSR 96-7p (emphasis added).  The ALJ used the two-step process and factors in SSR 96-7p and 20 C.F.R. §§ 404.1529 and 416.929 in evaluating Plaintiff's credibility.  Tr. at 33.  The ALJ found that Plaintiff has medically determinable impairments that could reasonably be expected to cause some of the symptoms described.  Tr. at 36.  However, the ALJ did not find Plaintiff entirely

credible based on evidence in the record. Tr. at 36. In November 2003, Dr. Holloway invalidated the results of the IQ test due to poor motivation by Plaintiff. Tr. at 519. In March 2005, Plaintiff's counsel referred him to the psychologist Dr. Morrello, who IQ tested Plaintiff and noted that Plaintiff was able to understand and follow instructions. Tr. at 542. Dr. Morrello further opined that Plaintiff "was unable to remember certain aspects of his past, such as his complete birth date, and this raises serious questions about the validity and reliability of certain aspects of this evaluation." Tr. at 546. In addition, in March 2005, Plaintiff testified that on a scale of zero to ten, his headaches are almost a ten on a daily basis. Tr. at 728. Plaintiff stated that he refuses to take any pain medication because he fears becoming addicted to the medication. Tr. at 727. The ALJ found that Plaintiff's failure to take prescribed pain medication is inconsistent with the degree of alleged headache pain. Tr. at 35. Therefore, from the evidence in the record, substantial evidence supports the ALJ's finding that Plaintiff was not entirely credible.

### (3)      Listing Impairment 12.05 (Mental retardation) Conclusion by the ALJ

The ALJ considered the testimony from the three ALJ Hearings; the relevant medical history; the medical limitations on Plaintiff's ability to work; and the longitudinal evidence in the record to find that Plaintiff did not meet the requirements for Listing 12.05. Tr. at 28-31. Specifically, the ALJ found that Plaintiff did not meet the threshold requirement of Listing 12.05 because he failed to establish that he had significant subaverage intellectual functioning with deficits in adaptive functioning that manifested prior to age 22. Tr. at 28-29. The ALJ relied on opinions of psychologists Dr. Allen-Henderson, Dr. Steward, and Dr. Blair, who all found that Plaintiff's ability to obtain a CDL license and lack of mental retardation diagnosis prior to age 18 indicates at least a borderline range of intelligence. Tr. at 28-29, 423, & 669. Moreover, the ALJ found that

Plaintiff's IQ test results were of questionable validity due to the statements by Dr. Holloway and Dr. Morrello. Tr. at 30-31. Substantial evidence supports the ALJ's decision that Plaintiff does not meet the criteria for Listing Impairment 12.05.

### c. Plaintiff's Severe Impairments Do Not Equal a Listing Impairment

Finally, Plaintiff contends that even if he does not satisfy the requirements of Listing 12.02 or 12.05, he may nevertheless medically "equal" a Listing Impairment. Pl. Doc. 12. at 10-12.

> (a) Your impairment(s) is medically equivalent to a listed impairment in appendix 1 if it is at least equal in severity and duration to the criteria of any listed impairment.
> (b) We can find medical equivalence in three ways.
> **(1)**(i) If you have an impairment that is described in appendix 1, but--
> (A) You do not exhibit one or more of the findings specified in the particular listing, or
> (B) You exhibit all of the findings, but one or more of the findings is not as severe as specified in the particular listing,
> (ii) **We will find that your impairment is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria.**
> **(2)** If you have an impairment(s) that is not described in appendix 1, we will compare your findings with those for closely analogous listed impairments. **If the findings related to your impairment(s) are at least of equal medical significance to those of a listed impairment**, we will find that your impairment(s) is medically equivalent to the analogous listing.
> **(3)** If you have a combination of impairments, no one of which meets a listing (see § 404.1525(c)(3)), we will compare your findings with those for closely analogous listed impairments. **If the findings related to your impairments are at least of equal medical significance to those of a listed impairment**, we will find that your combination of impairments is medically equivalent to that listing.

*See* 20 C.F.R. § 404.1526 (emphasis added). The ALJ found that Plaintiff did not medically equal a listing impairment. Tr. at 28-29 & 31. With regard to Listing 12.02 (Organic Mental Disorders), the ALJ found that Plaintiff has no more than a mild or moderate limitation in activities and social

functioning; Plaintiff has only a moderate limitation in maintaining concentration, persistence, or pace; Plaintiff has not established any episodes of decompensation; and Plaintiff is able to function outside a highly supportive living arrangement. Tr. at 31-33. The ALJ did not find that any of Plaintiff's mild or moderate limitations were of equal medical significance to the required criteria. Tr. at 28-29 & 31.

With regard to Listing 12.05 (Mental Retardation), the ALJ found that Plaintiff did not meet the threshold requirement of Listing 12.05 because he failed to establish that he had significant subaverage intellectual functioning with deficits in adaptive functioning that manifested prior to age 22. Tr. at 28-29. The ALJ did not find that any of Plaintiff's mild or moderate limitations were of equal medical significance to the required criteria. Tr. at 28-31. In addition, Dr. Blair testified that Plaintiff's psychological conditions cannot be combined to equal a listing impairment and must be evaluated under either 12.02 or 12.05. Tr. at 694. Dr. Blair stated he did not feel qualified to make a determination as to whether Plaintiff's headaches would enable Plaintiff to medically equal a listing impairment. Tr. at 694. However, the ALJ did not find Plaintiff's testimony regarding the severity of his headache pain entirely credible. *See supra*, Section II.D.3.b.(2), of this Report and Recommendation. Therefore, substantial evidence supports the ALJ's decision that Plaintiff does not medically equal the criteria for a listing impairment.

**\* Residual Functional Capacity Assessment \***
**(Needs to be Determined Before Proceeding to Step Four)**

> If your impairment(s) does not meet or equal a listed impairment, we will assess and make a finding about your residual functional capacity based on all the relevant medical and other evidence in your case record...We use our residual functional capacity assessment at the fourth step of the sequential evaluation process to determine if you can do your past relevant work...and at the fifth step of the sequential evaluation process (if the evaluation proceeds to this step) to determine if you can adjust to other work...

> Residual functional capacity assessment. Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your limitations. We will assess your residual functional capacity based on all the relevant evidence in your case record....

> Residual functional capacity is a measurement of the most a claimant can do despite his limitations. *See* 20 C.F.R. § 404.1545(a). According to the Social Security Administration, residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Regulation (SSR) 96-8p. Residual functional capacity is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain). *See* 20 C.F.R. § 404.1529(a).

*See* 20 C.F.R. § 404.1520(e); *see also* 20 C.F.R. § 404.1545(a); *see also Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006). The ALJ found that Plaintiff has the residual functional capacity to perform light work. Tr. at 33.

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the

ability to do substantially all of these activities.

*See* 20 C.F.R. § 404.1567(b).  Specifically, the ALJ found that Plaintiff had the residual functional

capacity to perform a range of light work; should work in a low stress environment with no

production line type of pace or independent decision making responsibilities; is limited to unskilled

work involving only routine and repetitive instructions and tasks; and should have no more than

occasional interaction with other people.  Tr. at 33.

In considering whether Plaintiff met the criteria for a Listed Impairment under Step Three,

the ALJ considered Plaintiff's medical evidence, severe impairments, physical and mental

limitations, pain symptoms, daily activities, and credibility.  *See supra*, Section II.D.3 of this Report

and Recommendation.  After evaluating these factors, the ALJ was also able to determine Plaintiff's

residual functional capacity.  Substantial evidence supports the ALJ's Residual Functional Capacity

Assessment that Plaintiff can perform light work.

### 4.     Step Four: Compare Residual Functional Capacity Assessment to Determine whether the Plaintiff Can Perform Past Relevant Work

> At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.
> 20 C.F.R. § 404.1520(a).
>
> Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it.
> 20 C.F.R. § 404.1560(b).
>
> Your impairment(s) must prevent you from doing your past relevant work.  If we cannot make a determination or decision at the first three steps of the sequential evaluation process, we will compare our residual functional capacity assessment...with the physical and mental demands of your past relevant work. (See § 404.1560(b).)  If you can still do this kind of work, we will find that you are not disabled.
> *See* 20 C.F.R. § 404.1520(f).

The ALJ found that Plaintiff is unable to perform his past relevant work as a dump truck / over the road truck driver, carpenter / general laborer, logger and farm laborer because they require medium to heavy physical exertion.  Tr. at 38.  The parties do not dispute the ALJ's findings in Step Four.

## 5.  Step Five: Consider Residual Functional Capacity Assessment, Age, Education, and Work Experience to Determine if the Plaintiff Can Perform Any Other Work

> At the fifth and last step...
>
> [i]f we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity assessment we used to decide if you could do your past relevant work when we decide if you can adjust to any other work.  We will look at your ability to adjust to other work by considering your residual functional capacity and your vocational factors of age, education, and work experience.  Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

*See* 20 C.F.R. § 404.1520(a); *see also* 20 C.F.R. § 404.1560(c).  At the final step of the disability analysis, the ALJ considered Plaintiff's age, education, work experience, residual functional capacity assessment, and vocational expert testimony to determine whether Plaintiff could perform any other work.

The ALJ noted that Plaintiff was 46 years old on the date of the ALJ's decision in January 2006, which makes him a younger individual as defined in the Social Security Act.  Tr. at 23 & 39.  *See* 20 C.F.R. § 404.1563 (age as a vocational factor).  The ALJ found that Plaintiff has marginal to limited education and transferability of job skills is not an issue in this case.  Tr. at 39.  *See* 20 C.F.R. § 404.1564 (education as a vocational factor); *see also* 20 C.F.R. § 416.968(d) (transferability of job skills).

Vocational Expert Tim Mahler testified that someone with Plaintiff's residual functional capacity would be able to perform light jobs that are unskilled, routine repetitive, and that deal with things and not people. Tr. at 704. Mr. Mahler stated that Plaintiff could work as an office cleaner, laundry folder, or hand packer, and that there were at least 2000 of these types of jobs available locally in northern West Virginia and southwestern Pennsylvania and 488,000 jobs available nationwide. Tr. at 704.

On cross-examination, Plaintiff's counsel asked if a person would be able to perform these jobs if that person had *marked* difficulties in concentration and pace. Tr. at 705-06 (italics added). Mr. Mahler responded that this would eliminate the ability to perform these jobs. Tr. at 705-06. From this testimony, Plaintiff contends that he is unable to perform the jobs identified by the vocational expert. Pl. Doc. 12 at 5-6, 11, & 13-14. However, the ALJ found that Plaintiff had *moderate* limitations with concentration, persistence, or pace, and substantial evidence supports the ALJ's decision. Tr. at 32-33 (italics added). *See supra*, Section II.D.3.a.(1)(c), of this Report and Recommendation.

After considering the Plaintiff's age, education, work experience, residual functional capacity assessment, and vocational expert testimony, the ALJ found that there are jobs that exist in the national economy that the Plaintiff could perform. Tr. at 40. Substantial evidence supports the ALJ's decision that Plaintiff could perform other work.

> Substantial evidence...consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance...Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment...if the decision is supported by substantial evidence. *See Laws*, 368 F.2d at 642; *Snyder*, 307 F.2d at 529. **Ultimately, it is the duty of the administrative law judge reviewing a case, and *not* the responsibility of the courts, to make findings of fact and to**

> **resolve conflicts in the evidence.** *King*, 599 F.2d at 599. "This Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist*, 538 F.2d at 1056-57; "We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of non-persuasion." *Blalock*, 483 F.2d at 775. **"The language of the Social Security Act precludes a *de novo* judicial proceeding and requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"**

*See Hays*, 907 F.2d at 1456 (emphasis added). Therefore, this reviewing Court will uphold the ALJ's decision that Plaintiff could perform other work because it is supported by substantial evidence.

In conclusion, the ALJ found that based on the Plaintiff's applications filed on July 19, 2001, August 1, 2001, and July 16, 2003, the Plaintiff is not entitled to a period of disability, disability insurance benefits, or supplemental security income. Tr. at 40. The Court finds that substantial evidence supports the ALJ's decision that Plaintiff is not disabled and can perform other work in the national economy.

## III.     RECOMMENDATION AND CONCLUSION

The undersigned Magistrate Judge hereby **RECOMMENDS** that the District Court **GRANT** Defendant's Motion for Summary Judgment **[14]**, **DENY** Plaintiff's Motion for Summary Judgment **[11]**, and **AFFIRM** the Decision of the Administrative Law Judge. The Court notes the Plaintiff's objections to the ruling.

Within ten (10) days of receipt of service of this Report and Recommendation, any counsel of record may file with the Clerk of the Court any written objections to this Recommendation. The party should clearly identify the portions of the Recommendation to which the party is filing an objection and the basis for such objection. The party shall also submit a copy of any objections to

the Honorable Robert E. Maxwell.  Failure to timely file objections to this Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon this Recommendation.  28 U.S.C. § 636(b)(1).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

**DATED: August 27, 2009**

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE